IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

HYER STANDARDS, LLC,

                      Plaintiff,

v.                                                  Case No.: 1:18-cv-06669

SUPER G CAPITAL, LLC,
MULTIPOINT, INC.,
ASHLEY ISENBERG,
WORLDPAY,

                      Defendants.

## HYER STANDARDS, LLC'S BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS

      Plaintiff Hyer Standards, LLC, by its attorneys, Nash, Spindler, Grimstad & McCracken LLP, hereby provide the following factual and legal support in opposition to the defendants' Motion to Dismiss.

### INTRODUCTION

      Jayme Hyer owns Hyer Standards, LLC (hereinafter "Hyer"), a payment systems processing company located in Plover, Wisconsin. Duane Vandre and Donald Lewis perform customer service and sales for the company. Hyer provides credit and debit card processing for businesses in Northwestern Wisconsin. Hyer must partner with a credit card processor to process customer accounts. Prior to entering into an agreement with defendant Multipoint Inc. (hereinafter "Multipoint"), Hyer partnered with processors First Data and First American. In those relationships, Hyer would be responsible for selling, placing and servicing credit and debit card payment terminals and First American and First Data would process those credit card payments. Hyer would receive residuals

1

which are a percentage of the amounts paid by the merchants to the credit card processors First American and First Data. This is how Hyer makes money. Hyer had a very successful business. At the time of Hyer's agreement with Multipoint, Hyer had 223 active accounts with its processor First Data, generating $14,490.62 per month in residual income for Hyer.

## BACKGROUND

In 2016/2017, Hyer was in need of a new credit card processor for its First Data accounts due to the advent of chip enabled credit and debit cards. Customers using Visa/Mastercard credit cards found out that if the merchant did not use a chip reader, they could dispute the charge and the credit card company would always side with the cardholder. This created problems for Hyer and its customers. Hyer reached out to Worldpay directly to see if Worldpay could become the new processor for these merchants. Worldpay told Hyer that transferring these accounts would cost Hyer a $20,000 registration fee and $300 in equipment charges for each customer ($60,000 total for all accounts). Worldpay told Hyer that they could avoid these charges by partnering with Multipoint. Further, Multipoint had a lower transaction rate with Worldpay which meant more money for Hyer's customers. Hyer began a discussion with Ashley Isenberg (hereinafter "Isenberg") from Multipoint who made many representations regarding Multipoint's ability to process and service Hyer's accounts. Ms. Isenberg talked up Multipoint and assured Hyer that Multipoint had the knowledge, resources, and employees to service Hyer's 223 active First Data accounts. Many of these representations turned out to be untrue causing significant problems for Hyer.

Based upon the representations of Ms. Isenberg, Hyer and Multipoint entered into a Portfolio Purchase Agreement whereby Hyer would sell its portfolio of 223 First Data accounts to Multipoint to process. (Graff Aff., Exhibit A, Portfolio Agreement). In return, Multipoint agreed to pay Hyer $110,000 over twelve months, pay off Hyer's loan to Super G Capital, LLC in the amount of $15,396.98, and reimburse Hyer for $10,000 for Visa/Mastercard registration fees. In addition, Multipoint agreed to pay Jayme Hyer ten percent of the residual payments it received for accounts transferred and fifty percent residuals for new accounts that Hyer would sign up for payment processing service through Multipoint. In addition, Multipoint agreed to hire Hyer's two sales representatives Duane Vandre and Donald Lewis and pay them fifty percent of the residuals that Multipoint received from the portfolio residuals and for future accounts they would sign up for Multipoint.

Almost immediately upon signing the agreement, Hyer began experiencing difficulties. The payments that were made to Hyer, Jayme Hyer and her salespeople were always late and less than the amount owed. Ms. Isenberg did not know how to read or understand residual reports generated by First Data which were used to calculate commission payments to the salespeople and Hyer. Ms. Isenberg repeatedly locked herself out of First Data's online portal due to unknown passwords or lack of use. First Data is all online and will lock out users due to inactivity or failed passwords. Hyer's office manager trained many different people at Multipoint on how to properly access the online portal and these people either left the company or did not understand what was told to them. Of particular importance is the fact that only one user can access the First Data

3

online portal so once Ms. Isenberg was a user she was the only person who could access that information.

Further, Multipoint only made five payments of $9,000 and stopped making payments to Hyer and Jayme Hyer in October of 2017. Multipoint continued to underpay Duane Vandre and Donald Lewis their commissions until August of 2018 when those payments stopped when Multipoint sold Hyer's portfolio to Worldpay.

To make matters worse, Multipoint used Hyer's residual income to take out a large loan from Super G and so all of this residual income, a percentage of which was due to Jayme Hyer and her employees, all went to Super G. In September of 2017, Hyer, through an attorney, reached out to Super G demanding that the residual income stop being directed to Super G because Multipoint had breached the agreement by failing to pay Hyer. Ultimately, Super G did restore this residual income in March of 2018, five months after the request but by that time it was too late as Hyer's reputation with these customers was ruined. When the residual from these accounts was transferred back to Hyer in March of 2018 only 80 of the 223 account were left.

In August of 2018 Multipoint sold Hyer's accounts to Worldpay which is why they have been brought into the lawsuit. Section 11.9 of the Portfolio Purchase Agreement between Hyer and Multipoint prohibits an assignment of that agreement which is exactly what Multipoint did. Multipoint does not own those accounts because Multipoint never paid for them. Worldpay has been non-responsive to requests to restore those accounts to Hyer.

Not only did Multipoint fail to pay Hyer for the accounts, but it completely abandoned servicing those accounts, which has resulted in severe damage to Hyer's

goodwill and a significant attrition of accounts. Multipoint's actions have totally and completely decimated Hyer's reputation and this damage will last forever. Super G and Worldpay have facilitated and helped this destruction. They had the ability to restore these accounts and income from these accounts to Hyer but failed, despite many requests. They gave cover to the fraud perpetrated by Multipoint which has led to Hyer's damages. There is liability for this action and inaction.

## PROCEDURAL POSTURE

As a result of the defendants' conduct, Hyer brought suit alleging several claims against the defendants. (See Amended Complaint). Several claims, at the pleadings stage, are now under scrutiny by the defendants. Hyer opposes the dismissal of its claims.[1]

## ARGUMENT

**I.      LEGAL STANDARDS**

When considering a moving party's motion to dismiss, the allegations in the complaint must be viewed in a light most favorable to the plaintiff. Bontkowski v. First Nat. Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993). The plaintiff is entitled to all reasonable inferences. Id. These motions are disfavored. Gray v. Dane County, 854 F.2d 179, 182 (7th Cir. 1988).

---

[1] Up until this point, the parties have not engaged in discovery, except such limited discovery as to facilitate mediation, which was unsuccessful. Thus, facts developed in the Amended Complaint have not been supplemented through discovery, but can be should the Court find any defects associated with the Amended Complaint.

## II. HYER DOES NOT DISPUTE THAT THE WIS. STAT. § 134.01 CLAIM SHOULD BE DISMISSED

Given that the governing provision of the agreement mandates that Illinois law govern these proceedings, Hyer concedes Illinois law governs this matter and consequently the Wis. Stat. § 134.01 claim must be dismissed.

## III. HYER HAS ADEQUATELY ALLEGED CIVIL CONSPIRACY

While the defendants correctly recite the elements necessary to establish civil conspiracy, they mistakenly apply the law. There are more than enough facts for this Court to deem the Amended Complaint adequate, at least at the pleadings stage. Hyer clearly plead that Hyer approached Multipoint to sell Hyer's portfolio residual. Shortly thereafter, Multipoint never paid Hyer, instead using the residuals to secure a loan from Super G. Super G, covering for Multipoint, was notified multiple times about Multipoint's breach, but still continued to direct the residuals to itself, despite the residual income belonging to Hyer. It is not a coincidence that just a few months after Multipoint and Hyer reached an agreement, Multipoint promptly used the residual money to secure a loan from Super G, and then when Hyer requested Super G to stop directing the residuals, Super G, in conjunction with Multipoint, failed to do so.

While the defendants bemoan that Hyer did not identify a specific agreement between Multipoint and Super G to conspire against Hyer, Hyer adequately laid out the facts necessary for this Court, at least at the pleadings stage, to infer that Super G and Multipoint conspired against Hyer to harm its reputation. It is well-established that civil conspiracy claims are rarely based on an explicit written agreement between the parties. To the contrary, civil conspiracy agreements, like the one here arise out of the defendants' actions. It is hard to understand how the defendants can represent to this Court that Hyer

6

is "silent as to who harmed it" and "when it was harmed" when the Amended Complaint clearly states that Multipoint and Super G's behavior has caused Hyer financial harm, including defaulting on financial obligations. That harm was done shortly after Multipoint and Hyer's agreement, which again is laid out in the Amended Complaint. It is not unreasonable for this Court to infer, as it is required to do under the law, that Multipoint and Super G conspired together to harm Hyer.

Even if the Court somehow finds the Amended Complaint deficient, it is well-established that there is a presumption in favor of giving the plaintiff at least one opportunity to amend the complaint as "denying a plaintiff that opportunity carries a high risk of being deemed an abuse of discretion." Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana, 786 F.3d 510, 518 (7th Cir. 2015). The plaintiff in Wouk was given at least two opportunities to amend his complaint. Wouk v. Mondi Packaging USA Inc., Case No. 13 C 1932, 2014 U.S. Dist. LEXIS 7848 (N.D. Ill. Jan. 22. 2014).

In this case, Hyer has never been given an opportunity to amend its Amended Complaint as a result of any alleged defect, but will do so if necessary.

## IV. HYER DOES NOT DISPUTE THAT PUNITIVE DAMAGES IS NOT A CAUSE OF ACTION

While retaining or dismissing the punitive damages claim has no effect on this matter as punitive damages still remains a remedy for Hyer, Hyer agrees that the punitive damages claim, as a cause of action, not a remedy, should be dismissed.

## V. ALL OF HYER'S MISREPRESENTATION CLAIMS SHOULD NOT BE DISMISSED

### A. HYER DOES NOT DISPUTE THAT COUNT V OF THE AMENDED COMPLAINT SHOULD BE DISMISSED

While Hyer disputes the reasons that defendants proffer to dismiss Count V of the Complaint, Hyer does not dispute that this cause of action should be dismissed as it is based on Wisconsin law, not Illinois law.

### B. THE NEGLIGENT MISREPRESENTATION CLAIM MUST NOT BE DISMISSED

The defendants argue, in part, that the economic loss doctrine precludes the negligent misrepresentation claim because the losses arise out of a failure to perform contractual obligations. While the defendants' recitation of the law is correct, defendants fundamentally misunderstand Hyer's negligent misrepresentation claim. The claim is not premised on any contractual obligations that the defendants did not meet, but rather that Multipoint represented that it was financially stable before entering into the agreement. That is not a contractual obligation, but an untrue representation that Multipoint made before the transaction. The negligent misrepresentation claim is further premised on the inaccurate representation that Multipoint alleged that it was an ISO processor, when in reality it was not. That was a representation before entering into the agreement, not a contractual obligation. At least at the pleadings stage, Hyer's negligent misrepresentation must not be dismissed.

### C. THE FRAUD CLAIMS AGAINST MULTIPOINT AND SUPER G MUST NOT BE DISMISSED

In a cursory section with little analysis, the defendants argue that the fraud claims against Multipoint and Super G must be dismissed. It is not clear what basis Multipoint is

8

relying on as it simply refers to "all of the previously stated reasons." However, arguments starting on page five of its brief may provide some guidance. There, Multipoint appears to argue that because the fraud claims have not been properly plead, the fraud claims must be dismissed. Here too, Multipoint is incorrect.

Hyer clear plead that Multipoint represented that it was a financially stable company capable of making payments, but that was not correct. Such representation caused Hyer to enter into the agreement with Multipoint. Multipoint secured a loan with Super G shortly after the agreement using Hyer's residuals and never paid Hyer as required. Hyer further plead that Multipoint claimed it was an ISO processor, a representation that was not true. Multipoint fraudulently represented its business in order to contract with Hyer, thereby causing it financial and reputational harm.

The fraud claim against Super G is intertwined with the fraud claim against Multipoint as the defendants, like the civil conspiracy claim, conspired together to harm Hyer.

Even if this Court somehow finds that the Amended Complaint does not meet the pleading standards, it is well-established that there is a presumption in favor of giving the plaintiff at least one opportunity to amend the complaint. Runnion.

### D. THE CONSUMER FRAUD CLAIM SHOULD NOT BE DISMISSED

The defendants fundamentally misstate the law when they argue that Hyer's consumer fraud claim based on the Illinois Consumer Fraud and Deceptive Business Practices Act must be dismissed, in part, because Hyer is not a consumer. However, that argument is plainly incorrect. The term "consumer" is defined under Illinois law as follows:

> any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household.

815 Ill. Comp. Stat. Ann. 505/1. The term "person" further is defined as:

> any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof.

815 Ill. Comp. Stat. Ann. 505/1. It is hard to understand how Hyer, a credit card processing company would not be considered a consumer under the plain language of the statute. Moreover, Hyer's Amended Complaint tracks the elements necessary to establish a consumer fraud claim.

### E.  HYER DOES NOT DISPUTE THAT THE RESCISSION CAUSE OF ACTION SHOULD BE DISMISSED

While retaining or dismissing the rescission claim has no effect on this matter as rescission still remains a remedy for Hyer, Hyer agrees that the rescission claim, as a cause of action, not a remedy, should be dismissed.

### F.  THE CIVIL THEFT CLAIM MUST NOT BE DISMISSED

Hyer's civil theft claim (also known as conversion) is premised on the idea that Super G was not authorized to deprive Hyer of its residual accounts. Contrary to the defendants' claims, Hyer specifically alleged that the residual income should not have been redirected to Super G, that is, the residual income does not belong to Super G. It is disingenuous and disappointing that defendants are claiming that they are not clear what specific residual income that Hyer is referring to when the accounts and residual income have been clearly identified in litigation. Defendants are attempting to be coy when they know full well what Hyer is referring to.

### G. THE PIERCING THE CORPORATE VEIL CAUSE OF ACTION MUST NOT BE DISMISSED

Ms. Isenberg was primarily the sole individual that Hyer interacted with, both prior to the agreement and during the agreement, leaving no separation between her and Multipoint. Contrary to the defendants' assertion that controlling the policies and business practices of Multipoint is not relevant to the piercing the corporate veil claim, Ms. Isenberg's control and conduct in this matter leave the impression that Ms. Isenberg and she alone had control in this matter, not Multipoint. That would directly implicate the factor "the corporation being a mere façade for the operation of the dominant shareholders." While Hyer may not ultimately pierce the corporate veil when the time comes, at least at the pleading stage, Hyer's Amended Complaint satisfies the federal pleadings standard.

### CONCLUSION

Hyer respectfully requests that the Court deny the defendants' Motion to Dismiss as Hyer, at least at the pleadings stage, has satisfied the federal pleadings standard.

Dated this 6th day of January, 2020.

NASH, SPINDLER, GRIMSTAD & McCRACKEN, LLP

*s/ Ryan R. Graff*

By: _____
Ryan R. Graff
State Bar No. 1051307
Attorneys for plaintiff Hyer Standards, LLC
Nash, Spindler, Grimstad & McCracken, LLP
1425 Memorial Drive
Manitowoc, WI 54220
Telephone: (920) 684-3321
Facsimile: (920) 684-0544
rgraff@nashlaw.com